Filed 7/22/14  P. v. Mays CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARK ANTHONY MAYS,<br><br>    Defendant and Appellant. | D065616<br><br><br>(Super. Ct. No. INF066689) |

APPEAL from a judgment of the Superior Court of Riverside, Richard A. Erwood, Judge.  Reversed in part, affirmed in part, and remanded for resentencing.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis, Eric A. Swenson and Jennifer Truong, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Mays guilty of kidnapping (Pen. Code, § 207);[1] forcible rape (§ 261, subd. (a)(2)); forcible penetration with a foreign object (§ 289, subd. (a)(1)); false imprisonment (§ 236); making criminal threats (§ 422); and forcible oral copulation (§ 288a, subd. (c)(2)). The jury also made true findings on kidnapping and tying and binding for the sex crime counts (§ 667.61, subd. (e)(1) & former (e)(6), now (e)(5).) Mays admitted prior convictions, including a prior serious or violent felony. (§§ 667.5, subd. (b), 667, subds. (c), (e).) The trial court sentenced Mays to a determinate term of 55 years four months and an indeterminate term of 50 years to life.

Mays contends (1) the trial court should have granted a mistrial based on prosecutorial misconduct because a witness referred to Mays having been in prison; (2) the trial court prejudicially erred in admitting evidence of Mays's prior domestic violence against his victim; (3) the trial court prejudicially erred in not sua sponte instructing the jury pursuant to CALCRIM No. 358 to view Mays's out-of-court oral statements tending to show his guilt with caution; (4) the sentence for the kidnapping count should have been stayed; (5) the trial court erred in deferring to the Department of Corrections and Rehabilitation the issue of Mays's presentence custody credits; and (6) the imposition of a victim restitution fine violated Mays's right to due process and a jury trial.

We conclude that two of Mays's sentencing arguments have merit: (1) as the Attorney General concedes, the sentence for the kidnapping count should have been

---

[1]    Unless otherwise indicated all statutory references are to the Penal Code.

2

stayed; and (2) the trial court erred in not calculating Mays's presentence credits.  The remainder of Mays's arguments lack merit.  Accordingly, we reverse and remand for resentencing and in all other respects affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mays and the victim of his crimes, Natalie,[2] were both recovering drug addicts who met at an Alcoholics Anonymous meeting in 2008.  Mays and Natalie developed a romantic relationship, started living together in Desert Hot Springs and relapsed into methamphetamine and alcohol use.

After having lived with Mays for several months, Natalie broke up with Mays in approximately June 2009 and moved away to live on her parents' boat in Orange County.  Natalie testified that although there were other reasons she broke up with Mays, during their relationship she had become scared of Mays because when he got mad he would put his hands around her throat and choke her until she passed out.  Mays tried to stay in contact with Natalie through texts and phone calls after they broke up, trying to reconcile with her, but according to Natalie, she would usually ignore him.

Natalie was visiting her parents' house in Palm Desert for a few days in late July and early August 2009.  According to Natalie, her parents discovered on Sunday, August 2, that she had relapsed into drug use because she had picked at her face, creating noticeable blemishes, after she used methamphetamine the previous two days.  According

---

[2]    Only Natalie's first name is used to protect her privacy.

to Natalie, after her parents discovered her recent drug use, they told her she had to move off of their boat and find her own housing.

As Natalie testified, Mays left a telephone message for her on Sunday, August 2, stating that he had some money. Because Natalie was in need of money for housing and felt that Mays owed her money from during their relationship, she called him and asked him to bring her some money.

At around 10:00 p.m., on August 2, Mays arrived at the security gate in the community where Natalie's parents lived. The security guard had instructions that Mays was not allowed to enter the neighborhood, so Natalie went to meet Mays at the gate. According to Natalie, as she spoke to Mays outside the security gate, Mays pleaded with her to get back together with him, but she refused. As Natalie described it, Mays became agitated, told her that her money was in a car parked a block way, and stated "I'll snap your neck right here on the sidewalk if you leave and walk away." Mays then calmed down and again asked Natalie to walk to the car, to which she agreed. Mays told Natalie he would give her a ride back to the security gate if she got into the car.

Natalie got into the back seat of the car with Mays. The driver was Jason Poisall, whom Natalie did not know. In the front passenger seat was Donald "Rocky" Morris, whom Natalie knew and liked. According to Natalie's testimony, instead of giving Natalie money and dropping her off at the security gate, Mays instructed Poisall to drive past the security gate and to lock the car doors. As they drove, Natalie told Mays that she wanted to go back to her parents' house, but Mays stated, "This is a kidnap/robbery."

4

Accordingly to Natalie, Mays stated they were going to drive to someone's house to pick up money.

During the drive, Mays noticed that Natalie was wearing jewelry that Mays recognized as coming from a mutual friend named Dave. Mays assumed that Natalie had been intimate with Dave, and he became extremely angry to the point that Natalie became scared of him. According to Natalie, Mays told her that he had been up for a couple of weeks without sleeping because he had been using methamphetamine. Natalie had been with Mays when he had not slept for a while, and she knew that lack of sleep made him irrational and prone to extreme mood swings.

As Natalie testified, while in the car Mays hit her in the face and choked her, and he told her to convince him that she still loved him. Natalie tried to tell Mays what he wanted to hear because she was scared of him. In the car, Mays unzipped his pants, grabbed Natalie by the hair and neck, and forced Natalie's mouth onto his erect penis. Also during the car ride, according to Natalie, Mays told Natalie that if she did not convince him that she still loved him by the time the car reached an upcoming bridge on the highway, he would throw her from the moving car. Mays then opened the door while Natalie grabbed onto the seat. During the car drive, Mays told Natalie he was going to take her to Sage Mountain, which she understood as a threat to kill her and leave her body there.

Mays and Poisall dropped off Morris at his house and then drove to Poisall's mobilehome. Mays had calmed down by the time they arrived at Poisall's home and stated he wanted to take a shower. Mays told Natalie to go into the bathroom with him

5

and take off her clothes. According to Natalie, Mays told her that she was going to do as he said, and he ordered her to stand with her leg elevated on the toilet and masturbate herself. Natalie testified that she complied because she was scared of Mays. According to Natalie, Mays pointed to some razorblades in the bathroom and told Natalie he would slice up her body with them if she did not comply. Mays then made Natalie get in the shower with him. While in the shower, Mays apologized for making her afraid.

After leaving the bathroom, Mays and Natalie went into the bedroom. Poisall stayed in the living room on the couch. According to Natalie, Mays continued to go through mood swings in the bedroom and continued to threaten her. Mays told Natalie that if she tried to leave he would shoot her down, and that he was sorry but he was going to have to kill her and Dave. At some point, Mays also told Natalie that to save her own life, he wanted her to kill Dave and her parents. In the bedroom, Mays hit Natalie in the face with the back of his hand, and he also pinned her down and choked her.

According to Natalie, Mays told her that they were going to have sex, and he wanted her to make him believe that they were still together and that she still loved him. Natalie told Mays she did not want to do it but would not resist because she was scared of him. Mays then performed oral sex on Natalie and had intercourse with her, ejaculating inside her. A medical exam later found Mays's sperm inside of Natalie's vagina. The same exam also found swelling to the left side of Natalie's face and an abrasion on her left ear consistent with blunt force injury.

After having sex with Mays, Natalie fell asleep. Natalie remembered waking up at some point and hearing Mays deciding how to restrain her because he had to go

6

somewhere. When Natalie woke up again, her ankle was attached to Mays's ankle with zip ties.

In the morning, Mays no longer wanted to kill Natalie, but he still wanted her to kill Dave. According to Natalie, after the zip ties were removed, Mays, Poisall and Natalie got into the car to carry out the plan to kill Dave. To placate Mays, Natalie acted like she wanted to get back together with Mays. After stopping at a gas station where Natalie used the restroom, they drove to Mays's mother's house and dropped off Natalie. According to Natalie, Mays left her there so he could go get guns to use in killing Dave.

Natalie was afraid of getting the police involved, but she called a friend from Mays's mother's house to pick her up. The friend contacted Natalie's parents, who called the police. The police arrived and transported Natalie to a hospital. Mays was arrested along with Poisall during a traffic stop on August 5, 2009.

Mays was charged with kidnapping to commit rape (§ 209, subd. (b)(1)); forcible rape (§ 261, subd. (a)(2)); forcible penetration with a foreign object (§ 289, subd. (a)(1)); false imprisonment (§ 236); making criminal threats (§ 422); and forcible oral copulation (§ 288a, subd. (c)(2)). The information further included special allegations that (1) for the kidnapping to commit rape count, Mays engaged in tying and binding (§ 667.61, former subd. (e)(6), now subd. (e)(5)) and kidnapping within the meaning of section 667.61 subdivisions (d)(2) and (e)(1); and (2) for the sex crime counts that Mays kidnapped the victim for the purpose of committing the sex crimes (§ 667.8, subd. (a)). The information alleged one prior serious and violent felony (§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)) and six prior felony convictions (§ 667.5, subd. (b)). Poisall was

7

charged with all of the same counts as Mays except for making a criminal threat and forcible oral copulation, and was additionally charged with simple kidnapping (§ 207, subd. (a)). Prior to trial, Poisall pled guilty to simple kidnapping and agreed to testify at Mays's trial.

Mays testified in his own defense at trial. According to Mays, Natalie called him to pick her up because she was being thrown out of her parents' house. Mays testified that although he did get mad in the car because of Natalie's contact with Dave, he did not threaten Natalie and did not assault her, and all of their sexual contact was consensual. According to Mays, Natalie was angry at him because he would not give her any methamphetamine, which is the reason that she falsely accused him of threatening and assaulting her. Mays admitted that he used zip ties to bind together his and Natalie's ankles, but he claimed the zip ties were Natalie's suggestion for an adventurous sexual experiment. During Mays's testimony, the jury also heard evidence that Mays had six prior convictions between 1986 and 2001.[3]

The jury convicted Mays of the lesser included offense of simple kidnapping (§ 207, subd. (a)); forcible rape (§ 261, subd. (a)(2)); forcible penetration with a foreign object (§ 289, subd. (a)(1)); false imprisonment (§ 236); making criminal threats (§ 422); and forcible oral copulation (§ 288a, subd. (c)(2)). On the sex crime counts, the jury also made true findings on simple kidnapping and tying and binding. (§ 667.61, subd. (e)(1)

---

[3] The jury heard evidence that Mays's convictions consisted of burglary, possession of stolen property, misdemeanor embezzlement, evading a police officer and possessing a firearm, and two convictions for possession for sale of methamphetamine.

& former (e)(6), now (e)(5).)  After Mays admitted his prior convictions, including a prior serious or violent felony (§§ 667.5, subd. (b), 667, subds. (c), (e)), the trial court sentenced Mays to a determinate term of 55 years four months and an indeterminate term of 50 years to life.

## II

## DISCUSSION

A.  *The Trial Court Did Not Err in Denying a Mistrial Based on Natalie's Mention of Mays Having Been in Prison*

During Natalie's testimony, she more than once alluded to the fact that Mays had been in prison.  Defense counsel made a motion for mistrial based on that testimony, which the trial court denied.  On appeal, Mays contends that the prosecutor committed prejudicial misconduct by permitting Natalie to mention Mays's prison record and that the trial court should have granted a mistrial.

We begin by reviewing the relevant trial proceedings.  Early in Natalie's testimony, the prosecutor asked her whether Mays was working when she met him.  In her answer, Natalie twice alluded to the fact that Mays was living in a halfway house because he had just gotten out of prison:

"Q.    When you first met Mr. Mays, was he working?

"A.    No, he lived in a halfway house.

"Q.    Okay.  And do you know how he supported himself?

"A.    I'm pretty sure that in the halfway house it's kind of a deal when you get out of prison that they - - I think he was taken care of there.  I'm under the assumption that that's how it goes, that they pay for it.

9

"Q.     Is that something he told you, about the halfway house?

"A.     I'm not sure if that's what he told me, but I'm pretty sure that's how they work when you get out of prison.  It's a transitional phase."

While speaking with counsel during a break in the testimony, the trial court noted Natalie's reference to Mays's prison history.  "Your witness has referred twice to the fact that Mr. Mays got out of prison, and I don't think that was proper."  The prosecutor stated that the testimony was "unanticipated," and the trial court reminded counsel that "the duty of a prosecutor is to make sure the witnesses aren't going to talk about things that are inadmissible, such as getting out of prison."  During the discussion with the trial court, defense counsel did not make any objection to the testimony or to the prosecutor's line of questioning or make any request for an admonition to the jury concerning Natalie's testimony.

Following the break, the prosecutor asked Natalie about Mays's plan to go pick up money from someone.  Natalie explained that the person from whom they were going to pick up money was "a friend — or not friend — that owed him."  Natalie testified, "I knew this guy that he was talking about."  She testified, "A guy named Dave, this Indian guy.  I don't know whether or not they'd spent time together, but they'd known each other for 20-plus years.  And we're friends; however, there was still some. . . ."

During the next break in testimony, defense counsel made a motion for mistrial. Defense counsel claimed that "three times now" Natalie had brought up the fact that Mays had been in prison.  The first two instances identified by defense counsel were Natalie's mention of the halfway house, and the third instance was purportedly when

10

Natalie stated that she did not know whether Mays and Dave had "spent time together." Defense counsel argued that a mistrial was warranted because the testimony was highly prejudicial, not relevant, and that it could not be cured through admonition. With respect to Natalie's statement that she didn't know whether Dave and Mays had "spent time together," the trial court observed, "Well that didn't really refer to prison, but the implication is some type of custody, I guess, could be inferred from that."[4]

The trial court offered to admonish the jury to disregard the reference to Mays being in prison, but defense counsel declined. The trial court then denied the mistrial motion, stating that Natalie's "brief references" did not irreparably prejudice Mays's right to a fair trial.

On appeal, Mays argues that the prosecutor committed misconduct by eliciting testimony in which Natalie mentioned Mays's prison history, and that based on the prosecutorial misconduct, the trial court should have granted a mistrial.

---

[4]     In our view, the trial court was being very generous to state that "some type of custody, I guess, could be inferred from" Natalie's reference to Dave and Mays possibly having "spent time" together. A reasonable person hearing the phrase "spent time" would not normally think of spending time in a penal institution. The colloquial phrases that normally refer to incarceration are "doing time" or "serving time," not "spending time." Further, as Natalie stated, she knew that Dave and Mays were long-term acquaintances in that "they'd known each for 20-plus years," but she appears to have been expressing her uncertainty about whether Dave and Mays were actually friendly with each other by saying that Dave was a "a friend — or not a friend — that owed" Mays some money, and that she did not know "whether they'd spent time together."

11

1.      *The Prosecutorial Misconduct Argument Is Without Merit*

Mays's primary contention is that the trial court erred by not granting a mistrial. However, he also makes a separate argument that, regardless of the mistrial motion, reversal is required because of prejudicial prosecutorial misconduct.  We accordingly turn to that issue first.  As we will explain, Mays's prosecutorial misconduct argument, standing alone, is without merit.

Prosecutorial misconduct exists " 'under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Earp* (1999) 20 Cal.4th 826,  858.)  Further, a defendant's federal due process rights are violated when prosecutor's misconduct " ' " 'infect[s] the trial with unfairness,' " ' " making it fundamentally unfair. (*Ibid.*)  A showing of bad faith on the part of the prosecutor is not required to establish misconduct.  (*People v. Hill* (1998) 17 Cal.4th 800, 822.)  However, " '[t]o preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition . . . .' " (*Earp*, at p. 858.)  As an exception to this rule, "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile.  [Citations.]  In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' " (*Hill*, at p. 820.)

For the purpose of preserving the issue of prosecutorial misconduct for appeal, a motion for mistrial is not the same thing as a timely objection and request for admonition. Although a motion for mistrial will preserve the issue of whether the trial court erred in

12

denying the mistrial motion, it will not serve to preserve for appeal the separate issue of prosecutorial misconduct when defense counsel failed to make an objection or request an admonition. (*People v. Silva* (2001) 25 Cal.4th 345, 373 [following denial of a mistrial motion, the defendant's prosecutorial misconduct argument was forfeited on appeal because he failed to request an admonition, but the ruling on the mistrial motion was reviewable]; *People v. Collins* (2010) 49 Cal.4th 175, 198-199 (*Collins*) [defendant's prosecutorial misconduct argument, based on a witness's mention of defendant's prison history, was forfeited on appeal for failure to request a jury admonition, but the appellate court could review the denial of defendant's mistrial motion insofar as the defendant claimed prejudice from the witness's testimony].)

Here, defense counsel made no objection based on prosecutorial misconduct during Natalie's testimony and did not request that the jury be admonished. As we have explained, it was the trial court, not defense counsel, who — after the fact — noted Natalie's first two references to Mays having been in prison. When Natalie made the purported third reference to Mays's prison history (i.e., the reference to possibly having "spent time" with Dave), defense counsel did not make an objection during the testimony. Instead, defense counsel waited and addressed Natalie's references to Mays's prison history by making a motion for a mistrial based on the prejudice caused by *Natalie's* statements, not by identifying any specific objectionable misconduct by the prosecutor. The trial court offered to admonish the jury, but defense counsel declined the offer.

We see no indication that a timely objection would have been futile or that an admonition to the jury would have been ineffective. The fact that the trial court brought

13

up the issue *on its own* and then offered to admonish the jury shows that the trial court would have been receptive to an objection.  Further, case law establishes that when a witness makes a fleeting reference to a defendant's criminal history, as was done here, an admonition to the jury is presumed to be effective to address any prejudice, and a defendant is accordingly not excused from requesting an admonition.  (*People v. Valdez* (2004) 32 Cal.4th 73, 125 (*Valdez*) [failure to preserve prosecutorial misconduct by not requesting an admonition was not excused when a witness's "isolated reference" to the defendant's having been incarcerated "was not so grave that a curative instruction would not have mitigated any possible prejudice to defendant"]; *Collins*, *supra*, 49 Cal.4th at pp. 198, 199 [appellate argument of prosecutorial misconduct based on witnesses' "brief and ambiguous" mention of defendant being in prison was not preserved because defense counsel rejected the trial court's offer to admonish the jury].)

Even were the claim of prosecutorial misconduct preserved for appeal, it fails on the merits.  Prosecutorial misconduct exists under state law only if the prosecutor uses " ' " 'deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' "  (*Earp*, *supra*, 20 Cal.4th at p. 858.)  Here, there is no evidence of any deceptive or reprehensible conduct by the prosecutor to support a misconduct claim under state law.  The prosecutor's questions did not logically call for Natalie to testify that Mays had been in prison, and thus there is no basis for us to conclude that any deceptive or reprehensible misconduct by the prosecutor was behind Natalie's statements.  Instead, as the prosecutor explained to the trial court, when he asked Natalie how Mays supported himself when she met him, he expected, based on previous conversations with Natalie,

14

that Natalie would state that Mays had a nighttime job. We perceive no reason to doubt the prosecutor's statement that Natalie's testimony about Mays living in a halfway house was unanticipated.

A prosecutor commits misconduct under federal law when "his . . . conduct . . . infects the trial with such unfairness as to render the subsequent conviction a denial of due process." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) As we have explained, all indications are that Natalie's statements about Mays being in prison were unanticipated and not solicited by the questions asked by the prosecutor. Thus, the record reflects no misconduct by the prosecutor that infected the trial with unfairness. (*Valdez*, *supra*, 32 Cal.4th at p. 125 [discerning "no misconduct on the part of the prosecutor" when a witness mentioned defendant having been incarcerated because the record reflected that the prosecutor did not intentionally solicit, and could not have anticipated, the witnesses testimony based on the question].) Further, as we will explain more fully in connection with our discussion of the denial of the motion for mistrial, Natalie's statements were "brief and isolated" (*People v. Dement* (2011) 53 Cal.4th 1, 40) and thus did not rise to the level of denying Mays his right to due process.

2. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion for Mistrial*

Having rejected Mays's contention that the prosecutor engaged in misconduct, the next issue is whether, even apart from any prosecutorial misconduct, the trial court should have granted Mays's motion for mistrial because of any prejudice caused by *Natalie's volunteered statements* about Mays having been in prison.

15

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573.) " 'Although most cases involve prosecutorial or juror misconduct as the basis for [a mistrial] motion, *a witness's volunteered statement* can also provide the basis for a finding of incurable prejudice.' " (*People v. Williams* (1997) 16 Cal.4th 153, 211, italics added.)

" 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion." (*People v. Avila*, *supra*, 38 Cal.4th at p. 573.)

"Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis." (*People v. Chatman* (2006) 38 Cal.4th 344, 369-370.) "There is little doubt exposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial. [Citations.] [¶] Whether in a given case the erroneous admission of such evidence warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580-1581.)

In this case, the trial court was well within its discretion to conclude that any harm caused by Natalie mentioning that Mays had been in prison was not incurably prejudicial. The two references to Mays having been in a halfway house were brief and isolated, and

16

the statement that Mays might have "spent time" with Dave was not likely to have been understood by the jury as a reference to serving time in prison. Case law holds that when a witness makes brief, isolated or vague statements referring to a defendant's prior incarceration or criminal history, any prejudice to the defendant can be cured by an admonition to the jury. (*Collins*, *supra*, 49 Cal.4th at p. 199 [trial court did not abuse its discretion in denying mistrial motion based on witness's remarks identifying the name of a prison from which the defendant made phone calls because the "remarks . . . were brief and ambiguous" and "any prejudicial effect could by cured by an admonition"]; *People v. Avila*, *supra*, 38 Cal.4th at p. 574 [the trial court did not abuse its discretion in denying a mistrial motion after a witness mentioned the defendant recently getting out of prison because the court admonished the jury not to consider it for any purpose]; *People v. Leavel* (2012) 203 Cal.App.4th 823, 831 [the trial court acted within its discretion by denying a mistrial motion when a witness referred to the defendant having been in a detention center because any prejudice from the testimony was "easily cured by striking the evidence and admonishing the jury to disregard it"].)

Further, we note that the proper analysis is whether the prejudice caused by Natalie's remarks *could have been* cured by the trial court's offer to give an admonition, not whether an admonition was *actually given*. (*Collins*, *supra*, 49 Cal.4th at pp. 198-199 [although the defendant refused the trial court's offer to admonish the jury, the trial court was within its discretion to deny the mistrial when the witness's remarks were brief and ambiguous and any prejudice *could have been* cured by an admonition].) Here, because Natalie's statements were brief, vague and isolated, the trial court reasonably could

17

conclude that any prejudice could have been cured by an admonition. The fact that Mays declined the trial court's offer to give the admonition is not relevant to our analysis.

When assessing the prejudicial nature of Natalie's testimony in the context of the entire trial, we may also consider that the jury later learned the details of Mays's convictions from Mays's own testimony and was instructed to consider Mays's criminal history only for the limited purpose of judging his credibility. Mays argues that it would be unfair to consider his own eventual testimony about his criminal history because he would not have decided to take the stand had Natalie not improperly mentioned that he was in prison. In the specific context of this case, Mays's position lacks merit. When confronted with a similar argument in *Collins*, *supra*, 49 Cal.4th 175, our Supreme Court reviewed the record and concluded that it was "part of defendant's trial strategy" to take the stand and that "given the limited nature" of the witness's remarks about the defendant having been in prison, it was not "persuasive" for the defendant to argue that he would not have taken the stand absent the witness's remarks. (*Id.* at p. 199.) *Collins* accordingly considered the content of defendant's testimony about his prior convictions in assessing whether a witness's statement about defendant having been incarcerated was prejudicial. (*Ibid.*) We do the same here. Because most of the relevant events took place when Mays and Natalie were alone together, it was clearly part of Mays's trial strategy to take the stand and set forth his own version of events in which he claimed that he did not threaten Natalie, she consented to all of the sexual conduct, and she retaliated against him for refusing to get drugs for her.

18

Plainly, Natalie's limited statements about Mays having been in prison did not prejudice Mays any more than the information that the jury heard through Mays's own admissions about his numerous criminal convictions. Further, because Mays testified about his own criminal history, the trial court instructed the jury that they were to use evidence of Mays's criminal history only for judging his credibility. That instruction further reduced the possibility of prejudice to Mays from Natalie's reference to Mays's time in prison.

We accordingly conclude that the trial court properly denied the mistrial motion because Natalie's references to Mays having been in prison were not irreparably prejudicial within the context of the entire trial.

B.   *The Trial Court Properly Admitted Evidence of Mays's Prior Domestic Violence Against Natalie*

We next consider whether the trial court erred in admitting evidence about Mays's prior domestic violence against Natalie.

During Natalie's testimony, defense counsel objected to a question about whether Natalie had seen Mays become violent during their relationship. The trial court ruled that it would allow testimony about Mays previously inflicting violence upon Natalie. Natalie then testified that when Mays was mad he "put his hands around my throat until I passed out." She said it happened "a few" times, and she accordingly became scared of Mays over the course of their relationship.

Under Evidence Code section 1101, subdivision (a), evidence of a defendant's character, including instances of uncharged misconduct, is not admissible to show the

19

defendant had the criminal propensity to commit the charged crime. However, prior acts evidence may be admitted when it is relevant to prove a fact other than the defendant's character or disposition, including, as relevant here, "whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented." (Evid. Code, § 1101, subd. (b).) If the evidence is admissible on a proper basis, the trial court may still exclude the evidence pursuant to Evidence Code section 352 if it is unduly prejudicial. (*People v. Lindberg* (2008) 45 Cal.4th 1, 22-23.) We review the trial court's rulings on the admission of evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.)

Mays contends that his prior acts of domestic violence against Natalie were not relevant to any issues in the case and should not have been admitted. We disagree. The main contested issue at trial was whether Natalie consented to the sexual conduct with Mays or whether she complied only because she felt scared and threatened. Natalie specifically testified that she was aware that Mays was capable of violence against her based on her past experience with him, and she accordingly did what he told her to do in order to prevent him from carrying out his threats to hurt and kill her. Evidence that Mays had previously committed domestic violence against Natalie was directly relevant

to the issue of whether Natalie consented to the sexual contact with Mays during the incident or whether she complied out of fear.[5]

Mays also contends that even if the prior domestic violence was admissible to show whether Natalie consented, the evidence should not have been admitted under Evidence Code section 352 because it was unduly prejudicial. Pursuant to section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490.) " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*Id.* at p. 491.)

Mays argues that the evidence of his prior domestic violence had a tendency to evoke an emotional bias against him because it portrayed him as "an extremely angry and violent man." Mays contends that balanced against the prejudicial effect, the evidence had little probative value because "at best [it] had little effect on the disputed issue of consent because it did not relate to Natalie's mental state in responding to Mays's actions and sexual overtures." We disagree. The emotional reaction of a juror to hearing

---

5      Mays also claims the evidence should not have been admitted because it was cumulative. This argument is without merit because Mays identifies no other evidence at trial of his prior conduct toward Natalie that would tend to show that Natalie reasonably believed that Mays would carry out his threats to hurt and kill her.

evidence of Mays's prior domestic violence against Natalie would be no stronger than the reaction to hearing of Mays's similar violent conduct during the instant offense. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [prejudice of uncharged acts lessened because they were "no more inflammatory" than the charged offenses].) Further, contrary to Mays's contention, the evidence of prior domestic violence was *highly* relevant to show Natalie's state of mind when Mays threatened to hurt and kill her during the crimes at issue here. As Natalie explained several times during trial, she was scared of Mays because she knew what he was capable of doing to her.

Accordingly, the trial court was well within its discretion to admit evidence of Mays's prior domestic violence against Natalie.

C.      *The Failure to Instruct with CALCRIM No. 358 Was Harmless*

Although the jury heard evidence of numerous out-of-court statements made by Mays during the commission of the crimes which tended to show his guilt, the trial court did not instruct the jury with CALCRIM No. 358, which provides: "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."

22

The parties appear to agree that CALCRIM No. 358 was applicable here and therefore the trial court should have sua sponte instructed the jury with it. (*People v. McKinnon* (2011) 52 Cal.4th 610, 679 (*McKinnon*).) As there is no dispute that the court should have instructed with CALCRIM No. 358, we consider only whether the omission was harmless.

"In determining whether the failure to instruct requires reversal, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.' [Citations.] ' "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]" ' [Citations.] [Our Supreme Court] has held to be harmless the erroneous omission of the cautionary language when, in the absence of such conflict, a defendant simply denies that he made the statements. [Citation.] Further, when the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, we have concluded the jury was adequately warned to view their testimony with caution." (*McKinnon*, *supra*, 52 Cal.4th at pp. 679-680.)

Here, the omission of CALCRIM No. 358 was harmless because Mays took the stand and "simply denied making the statements." (*McKinnon*, *supra*, 52 Cal.4th at p. 680.) Mays testified at length and stated that he did not make any of the threats to Natalie described by any of the other witnesses.

23

The other instructions given to the jury concerning witness credibility also alleviated any prejudice in failing to give CALCRIM No. 358. (See *People v. Sanders* (1995) 11 Cal.4th 475, 536-537 [considering other jury instructions when assessing prejudice].) The trial court gave detailed instructions on how to assess witness credibility. (See CALCRIM Nos. 105, 226.) The trial court also instructed the jury that in the case of a conflict in the evidence, it "must decide what evidence, if any, to believe" (CALCRIM No. 302), and to view accomplice testimony with caution (CALCRIM No. 335). Since these instructions adequately advised the jury on how to assess witness credibility and provided guidance on whether to credit a witness's testimony, we conclude that any error in failing to give an explicit cautionary instruction was harmless. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 393 [failure to give cautionary instruction harmless error when trial court "fully instructed the jury on judging the credibility of a witness, thus providing guidance on how to determine whether to credit the testimony"]; *People v. Quach* (2004) 116 Cal.App.4th 294, 299-300 [failure to give cautionary instruction harmless error when trial court instructed jury "to exercise caution in considering all the evidence which bore on the proof of any fact"].)

D. *The Trial Court Should Have Stayed the Sentence on the Kidnapping Count*

Mays contends that the trial court erred in imposing, rather than staying, the 16-year consecutive term it imposed for the kidnapping count.

In his opening brief, Mays premised his argument on section 654, arguing that the kidnapping count was based on an indivisible course of conduct that included the sex

24

crimes.[6]  The Attorney General concedes that the sentence on the kidnapping count should have been stayed, but she sets forth a different legal basis.  Specifically, the Attorney General points out that because Mays's kidnapping of Natalie was used as an aggravating factor to impose a 25-year-to-life term under the "One Strike" law (§ 667.61, subds. (a), (c), (e)), the trial court was required to stay the separate sentence imposed on the kidnapping count pursuant to section 667.61, subdivision (f).  In Mays's reply brief, he agrees with the Attorney General's analysis.

The One Strike law requires that a 25-year-to-life sentence be imposed for qualifying sex crimes, including forcible rape (§ 261, subd (a)(2)), when at least two of the aggravating circumstances listed in section 667.61, subdivision (e) are established. (§ 667.61, subds. (a), (c), (e).)  Here, the jury made findings on two aggravating circumstances:  tying and binding (§ 667.61, former subd. (e)(6), now subd. (e)(5)), and simple kidnapping (§ 667.61, subd. (e)(1)).  The trial court accordingly used those two aggravating factors to sentence Mays to a term of 25 years to life for forcible rape under the One Strike law (§ 667.61, subd. (a)), which was then doubled to 50 years to life under the "Three Strikes" law.  (§ 667, subds. (c), (e)(1); *People v. Acosta* (2002) 29 Cal.4th 105, 118-128.)

_____

6      Section 654 provides in relevant part:  "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

The One Strike law provides, in general, that conduct necessarily used as an aggravating factor in sentencing a defendant may not *also* be punished under another provision of law. Specifically, section 667.61, subdivision (f) provides: "If only the minimum number of circumstances specified in subdivisions (d) or (e) that are required for the punishment provided in subdivisions (a), (b), (j), (*l*), or (m) to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivisions (a), (b), (j), (*l*), or (m) whichever is greater, rather than being used to impose the punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or the punishment under another provision of law can be imposed in addition to the punishment provided by this section. However, if any additional circumstance or circumstances specified in subdivision (d) or (e) have been pled and proved, the minimum number of circumstances shall be used as the basis for imposing the term provided in subdivisions (a), (j), or (*l*) and any other additional circumstance or circumstances shall be used to impose any punishment or enhancement authorized under any other provision of law."

Here, the two aggravating circumstances of tying and binding and simple kidnapping were *both* needed for the imposition of a 25-year-to-life sentence under section 667.61, subdivision (b) of the One Strike law. Therefore, pursuant to section 667.61, subdivision (f), the trial court was prohibited from *also* imposing punishment under the simple kidnapping count. (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 216 [trial court could not impose sentence for simple kidnapping which was also used as an aggravating factor under the One Strike law].) We accordingly agree with the

26

Attorney General that the trial court should have stayed the sentence on the simple kidnapping count pursuant to the One Strike law. (Cf. *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1127 [proper approach is to impose and then stay sentence on enhancements under § 12022.53 when statute provided that additional enhancements found to be true should not be "imposed"].) We therefore remand for the trial court to correct its sentencing error on the simple kidnapping count.

E.      *The Trial Court Erred in Not Calculating Mays's Presentence Custody Credits*

The abstract of judgment reflects that the trial court did not calculate the presentence custody credits to which Mays was entitled. (§ 2933.1, subd. (a).) Instead, the abstract of judgment states that the "Department of Corrections [is] to calculate credit for time served." Mays contends that it was error for the trial court to defer the calculation of his presentence custody credits to the Department of Corrections and Rehabilitation. The Attorney General agrees. (See *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 9 ["it is the duty of the trial court to award the correct amount of credits"].)

Although we have the authority on appeal to amend the judgment to award the correct amount of presentence custody credits (*People v. Acosta*, *supra*, 48 Cal.App.4th at pp. 427-428), because we are remanding this matter for resentencing in connection with the sentencing error on the simple kidnapping count, we direct that during resentencing the trial court should calculate and award presentence custody credits to Mays.

F.      *The Trial Court Did Not Err in Imposing a Victim Restitution Fine*

The trial court ordered Mays to pay a victim restitution fine of $10,000 pursuant to section 1202.4, subdivision (b). Mays contends that a restitution fine imposed under section 1202.4, subdivision (b) violates a defendant's rights to due process and jury trial because it is not based on facts determined by a jury. Mays's contention lacks merit and has been previously considered and rejected by persuasive case law. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 351 (*Kramis*).)

Section 1202.4, subdivision (b) provides that "[i]n every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." The statute states that "[t]he restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense" and gives a statutory range, which as of January 1, 2013, was a range of $240 to $10,000 for a person convicted of a felony. (§ 1202.4, subd. (b)(1).)[7] The statute also sets forth one possible method for the court to chose in exercising its discretion to set the amount of the fine, which is to "determine the amount of the fine as the product of the minimum fine . . . multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (§ 1202.4, subd. (b)(2).) In setting the amount of the fine, "the court shall consider any

---

[7]      A prior version of the statute had a slightly lower statutory minimum. (See *Kramis*, *supra*, 209 Cal.App.4th at p. 349 [$200 statutory minimum in applicable version of statute].)

28

relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (§ 1202.4, subd. (d).)

Mays contends that because the trial court's exercise of discretion in the imposition of a restitution fine under section 1202.4, subdivision (b) involves some factual issues, such as the defendant's ability to pay, the nature of the offense and the defendant's economic gain, pursuant to *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Southern Union Co. v. United States* (2012) 567 U.S. __ [132 S.Ct. 2344] (*Southern Union Co.*), the trial court may not impose a restitution fine unless the amount of the fine is based on facts found by a jury. This argument was thoroughly examined and rejected in *Kramis*, *supra*, 209 Cal.App.4th 346. As we will explain, we agree with *Kramis* and adopt its reasoning here.

*Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S.

29

at p. 490, italics added.)  Later *Blakely v. Washington* (2004) 542 U.S. 296 stated that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Id*. at p. 303, italics omitted.)

Most recently, in *Southern Union Co.*, the United States Supreme Court applied *Apprendi* to the imposition of a criminal fine for violation of federal environmental laws. (*Southern Union Co.*, *supra*, 567 U.S. at pp. __ [132 S.Ct. at pp. 2349-2356].)  As *Kramis* explained, however, *Southern Union Co.* does not mean that the imposition of every type of criminal fine is suspect under *Apprendi*.  "The statutory fine imposed in *Southern Union Co.* was $50,000 for *each day* of violation.  In other words, the amount of the fine was tied to the *number of days the statute was violated.*  In *Southern Union Co.*, the trial court, not the jury, made a specific finding as to the number of days of violation.  The United States Supreme Court held the district court's factual finding as to the number of days the defendant committed the crime violated *Apprendi*.  (*Southern Union Co.*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2352].)" (*Kramis*, *supra*, 209 Cal.App.4th at p. 351.)

We agree with Kramis that "*Southern Union Co.* does not impact the restitution fine imposed in the present case" because "*Apprendi* and *Southern Union Co.* do not apply when, as here, the trial court exercises its discretion within a statutory range." (*Kramis*, *supra*, 209 Cal.App.4th at p. 351.)  *Kramis* pointed out that, "[a]s the United States Supreme Court held in *Apprendi*, '[N]othing in [the common law and constitutional history] suggests that it is impermissible for judges to exercise discretion — taking into

consideration various factors relating both to the offense and offender — in imposing a judgment *within the range* prescribed by statute.' " (*Ibid*.)  " '*Apprendi* distinguishes a "sentencing factor" — a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense" — from a "sentence enhancement" — "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" constituting "an increase beyond the maximum authorized statutory sentence."  [Citation.]'  [Citation.]  Nothing in *Southern Union Co.* alters that holding."  (*Ibid*.)

Here, as in *Kramis*, because "[t]he $10,000 section 1202.4, subdivision (b) restitution fine . . . was within that statutory range," "[t]he trial court did not make any factual findings that increased the potential fine beyond what the jury's verdict — the fact of the conviction — allowed.  Therefore, *Apprendi* and its progeny do not preclude [the] imposition" of the fine.  (*Kramis*, *supra*, 209 Cal.App.4th at pp. 351-352.)

## DISPOSITION

We reverse in part and remand for resentencing consistent with this opinion.  In all other respects judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.

31